# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 18-10085-01-EFM

EBUBE OTUONYE,

*Defendant.*

## MEMORANDUM AND ORDER

On July 23, 2019, a jury convicted Defendant Ebube Otuonye on Counts 1, 2, 3, and 4 of the Indictment. In Count 1, Defendant was found guilty of conspiracy to distribute Schedule II controlled substances outside the usual course of medical practice and without legitimate medical need in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 21 U.S.C. § 846. In Count 2, Defendant was found guilty of distributing Schedule II controlled substances outside the usual course of medical practice and without legitimate medical need in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). In Counts 3 and 4, Defendant was found guilty of health care fraud in violation of 18 U.S.C. § 1347. Defendant has now filed a Motion for Judgment of Acquittal or New Trial (Doc. 91). For the reasons stated below, the Court denies the motion.

## I. Factual and Procedural Background

Defendant was a licensed pharmacist and owned his own business, Neighborhood Pharmacy, in Wichita, Kansas. The Government indicted Defendant on charges that he reached an agreement with Doctor Steven Henson to fill prescriptions for controlled substances that Henson wrote for illegitimate purposes. According to the Indictment, Defendant filled prescriptions for approximately 21,681 pills of Oxycodone, 48,683 pills of Methadone, 18,049 pills of Hydromorphone (all Schedule II controlled substances) as well as 7,890 pills of Alprazolam (Schedule IV controlled substance) outside the usual course of professional medical practice and without a legitimate medical purpose. Defendant was charged with unlawfully distributing the prescription drugs, either as a principal or as an aider or abettor; he was also charged with conspiracy to distribute the prescription drugs. Additionally, the Government charged Defendant with committing health care fraud by submitting reimbursement claims to Medicare and Medicaid for prescriptions that were not for a legitimate medical purpose.

The Court held a jury trial from July 15–23, 2019. The Government called 24 witnesses during its case-in-chief. The Government's presentation of evidence included evidence that Defendant had a policy at his pharmacy (posted on a sign for all customers to see) that he would fill a prescription for a narcotic only if it was accompanied by three prescriptions for non-narcotics (hereinafter referred to as the "3-1 policy"). The Government admitted into evidence a voicemail Defendant left for Henson asking the doctor to write a prescription for three non-narcotics to accompany a prescription for narcotics one of Henson's patients brought to the Defendant's pharmacy.

At trial, the Government introduced evidence from multiple Henson patients who filled prescriptions at Defendant's pharmacy, discussing that Henson provided them prescriptions for

controlled substances in exchange for cash. One witness, Michael Osterman, testified that Henson's prescriptions were useless without a pharmacist willing to fill them. The Government introduced into evidence text messages Henson sent to his patients instructing them to go to Defendant's pharmacy after the patients were having trouble filling their prescriptions at other pharmacies.

The Government elicited testimony from other pharmacists and prescribers stating that the high quantity of pills and high dosages in the Henson prescriptions—as well as, at times, the duplicative or even dangerous drug combinations—should have alerted Defendant that the prescriptions were not for legitimate medical purposes. Additionally, the Government presented evidence that Defendant's relief pharmacist, Raghad Sabra, and his pharmacy tech, Colleen Pauly, were concerned about the legitimacy of Henson's prescriptions and raised those concerns with Defendant. Furthermore, Sabra, in exercising her independent professional judgment, refused to fill any prescriptions for Henson's patients.

The Government also admitted into evidence—with Defendant stipulating as to foundation—voluminous business records taken from Defendant's seized computer and the Kansas Prescription Drug Monitoring Program's records that were available to Defendant and showed how many prescriptions for controlled substances Henson's patients had filled (including at other pharmacies). The Government created various charts summarizing the information in these records and presented them to the jury.

The Government also called as a witness Korby Harshaw, who investigated health care fraud for the Department of Health and Human Services. Harshaw's testimony connected Medicare and Medicaid claims that Defendant submitted to several Henson prescriptions, including the three non-narcotics that Defendant solicited from Henson in his voicemail.

After the Government concluded its case-in-chief, both parties rested. Following deliberations, the jury returned a verdict of guilty on all four counts. Defendant then filed the present motion.

## II.  Discussion

**A.  Motion for Judgment of Acquittal**

Rule 29(c)(2) of the Federal Rules of Criminal Procedure states, in relevant part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." When reviewing the sufficiency of evidence to sustain a guilty verdict, the Court "ask[s], whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "[1] Substantial evidence must support the conviction, but " 'it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.' "[2] Furthermore, the Court cannot cast aspersions on the credibility of witnesses or weigh conflicting evidence, because "these matters are within the exclusive province of the jury."[3] In sum, the Court must "simply determine whether the evidence, if believed, would establish each element of the crime."[4]

Defendant asserts that, even when viewing the evidence in the light most favorable to the government, no reasonable juror could find him guilty beyond a reasonable doubt on any count.

---

[1] *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[2] *United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir. 2005) (quoting *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994)).

[3] *Magallanez*, 408 F.3d at 682 ("The jury apparently believed the witnesses, and that is the end of the matter.").

[4] *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (citation, alterations, and quotations omitted).

Defendant does not specifically address any element of any count for which he believes the Government's evidence to be lacking. Rather, Defendant makes two arguments about the evidence at trial generally. First, Defendant argues that at trial the Government relied heavily on evidence that Defendant's 3-1 policy. Defendant argues that he instituted this policy in an attempt to discourage individuals wanting to illicitly obtain prescription drugs from using his pharmacy. Second, Defendant argues that the evidence at trial showed that the number of pills Defendant dispensed to Henson's patients decreased monthly; Defendant suggests that people involved in the distribution of drugs, or drug trafficking organizations, generally do not peak in the first month but rather increase their sales over time. Neither argument is persuasive.

First, Defendant had the opportunity to argue his interpretation of the 3-1 policy to the jury. The Government's theory was that the 3-1 policy showed Defendant's efforts to conceal his illegal activity by keeping a low ratio of narcotic to non-narcotic prescriptions filled at his pharmacy. It was the jury's role to weigh the evidence and make its own determination about the intent behind Defendant's 3-1 policy and to consider that evidence in the context of all the evidence at trial. Defendant is asking the Court to reweigh the evidence at trial, something the Court cannot do.

Second, Defendant argues that "[p]eople involved in distribution of drugs, or drug trafficking organizations, generally do not peak in the first month [but] rather continue to increase their sales over time." Defendant, however, presented no evidence to the jury about the economics of the illegal drug trade, either generally or specific to pharmacists. Even if Defendant had presented such evidence, it would have been the jury's responsibility to weigh that evidence in conjunction with the rest of the evidence admitted at trial. Defendant's argument about what typically happens in the illegal drug trade has no bearing on the Court's determination of whether the jury had sufficient evidence to reach its verdict.

*1. Conspiracy (Count 1)*

To find Defendant guilty on Count 1, the jury was instructed that it must find beyond a reasonable doubt that: (1) Defendant reached an agreement with Henson to distribute prescription drugs outside the usual course of medical practice, (2) Defendant knew the essential objective of the conspiracy, (3) Defendant knowingly and voluntarily joined the conspiracy, and (4) there was interdependence between Defendant and Henson.[5] The jury was also instructed that the existence of a conspiracy "may be inferred from the circumstances and the conduct of the parties, since ordinarily a conspiracy is characterized by secrecy in its origin and its execution."[6] Defendant does not identify which element or elements he believes lacked sufficient evidence.

At trial, the Government presented overwhelming evidence that Defendant was filling prescriptions written by Henson that were outside the usual course of medical practice and without legitimate medical need. This evidence included testimony by several of Defendant's customers stating that the prescriptions were not for legitimate medical purposes. More importantly, the Government presented testimony from other pharmacists and prescribers showing that Defendant should have recognized the prescriptions as illegitimate based on the type and quantity of drugs prescribed. Additionally, Raghad Sabra (Defendant's relief pharmacist) and Colleen Pauly (Defendant's pharmacy technician) both testified that they had concerns about the Henson prescriptions; Sabra raised those concerns with Defendant and informed him that she was unwilling to fill Henson prescriptions. Lastly, the Government elicited testimony from multiple

---

[5] Doc. 84 at 24.

[6] Doc. 84 at 26.

witnesses indicating that Defendant's policy requiring three non-narcotic prescriptions for every narcotic prescription was highly unusual.

The Government also presented evidence that during the conspiracy the number of Henson's prescriptions that Defendant filled increased dramatically and the vast majority of those prescriptions were for controlled narcotics. The Government presented evidence that Defendant and Hanson had a substantial increase in contact by telephone and in person during the conspiracy. The jury listened to a voicemail Defendant left for Henson asking the doctor to write a prescription for three non-narcotics before the Defendant would fill a prescription for narcotics. Also admitted into evidence were text messages between Henson and Defendant's customers suggesting that Defendant had agreed to fill Henson's narcotic prescriptions. Finally, the Government introduced evidence that Henson's prescriptions were useless without a pharmacist willing to fill them and Henson's patients were increasingly having difficulty filling Henson's prescriptions at other pharmacies. Based on this evidence, the Court holds that a reasonable juror could have found Defendant guilty beyond a reasonable doubt on Count 1.

  2.  *Distributing a controlled substance (Count 2)*

To find Defendant guilty on Count 2, the jury was instructed that it must find beyond a reasonable doubt that: (1) Defendant distributed or dispensed controlled prescription drugs, (2) Defendant acted knowingly and intentionally, and (3) Defendant distributed the drugs outside the usual course of professional practice and without a legitimate medical purpose. Defendant was charged as either a principal or an aider and abettor. Defendant does not identify which element or elements he believes lacked sufficient evidence.

Much of the evidence discussed with regards to Count 1 applies equally to Count 2. Specifically, the Government presented testimony from multiple witnesses stating that Defendant

filled Henson's prescriptions. In addition, the Government presented evidence from two pharmacists who testified that details about the Henson prescriptions—including the dosages, pill quantities, and, at times, duplicative and dangerous drug combinations—should have alerted Defendant that the prescriptions were not for legitimate medical needs. The jury also heard testimony from Defendant's relief pharmacist, Sabra, who recognized the illegitimacy of the Henson prescriptions and raised those concerns with Defendant. The jury heard testimony from multiple witnesses that Defendant's 3-1 policy was highly unusual. The jury also listened to the voicemail where the Defendant enforced the 3-1 policy by asking Henson to write a prescription for three (unspecified) non-narcotics before he would fill a narcotic prescription, and the Government presented evidence that pharmacists soliciting unidentified prescriptions is not consistent with legitimate professional practice.

Although this is not the grand sum of the Government's evidence admitted at trial, it is sufficient for a reasonable juror to conclude, beyond a reasonable doubt, that Defendant knowingly and intentionally distributed controlled substances outside the usual course of professional practice and without a legitimate medical purpose.

   3. *Health care fraud (Counts 3 and 4)*

To find Defendant guilty on Counts 3 and 4, the jury was instructed that it must find beyond a reasonable doubt that: (1) Defendant knowingly and willfully used a scheme or artifice to defraud a health care benefit program, (2) Defendant made statements or representations, or omitted facts, which were material, (3) the statements or representations were false, (4) Defendant acted with specific intent to defraud, and (5) the scheme or artifice to defraud affected interstate commerce. Defendant does not identify which element or elements he believes lacked sufficient evidence.

In addition to the evidence discussed above regarding the illegitimacy of the Henson prescriptions, the Government called as a witness Korby Harshaw, who investigated health care fraud for the Department of Health and Human Services. Harshaw's testimony linked a number of Henson's illegitimate prescriptions to specific claims Defendant submitted to Medicare and Medicaid for reimbursement. Harshaw also testified that Defendant submitted a Medicaid claim for the three non-narcotics he solicited from Henson in his voicemail. Finally, Harshaw testified that unless Defendant submits a claim—a process that involves representing that the prescription was for a legitimate medical purpose—Medicare and Medicaid would never reimburse the costs. Based on all the evidence, the Court holds that a reasonable juror could return a guilty verdict on Counts 3 and 4.

**B.     Motion for a New Trial**

A court may "grant a new trial if the interest of justice so requires."[7] A motion for a new trial is viewed with disfavor, and courts only grant such motions with great caution.[8] The burden is on the defendant to prove the necessity of a new trial.[9] "[T]he relevant rule is that a new trial should be granted upon any error of sufficient magnitude to require reversal on appeal."[10]

Defendant raises four arguments in support of his motion for a new trial. First, Defendant argues that the jury was given a faulty verdict form. Second, Defendant argues that the Indictment contains an error in the number of pills listed in Counts 1 and 2. Third, Defendant argues that the

---

[7] Fed. R. Crim. P. 33(a).

[8] *United States v. Pearson*, 203 F.3d 1243, 1274 (10th Cir. 2000).

[9] *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan 2000) (citations omitted).

[10] *Id.* (quotations omitted).

admission of summary charts prepared by the Government was prejudicial and likely confused the jury. Fourth, Defendant asserts that Diversion Investigator O'Malley testified about the veracity of another witness.

   *1.     Verdict form*

Defendant argues that the Court should order a new trial because the jury was provided a "faulty verdict form." A motion for a new trial should only be granted if the complained of error would warrant reversal on appeal.[11] The Tenth Circuit has held that an error on a verdict form does not necessarily warrant reversal.[12] Instead, the relevant question is "whether [the verdict form], along with the instructions read to the jury, as a whole adequately stated the applicable law."[13] Reversal is appropriate only if there is "substantial doubt that the jury was fairly guided."[14]

Here, the verdict form for Counts 3 (Medicare fraud) and 4 (Medicaid fraud) provided the jury with a space to mark "Not Guilty" or "Guilty." If the jury returned a verdict of guilty on either count, the jury was asked to make a finding on the amount of loss. The Court added the "amount of loss" question to the verdict form at the Government's request, but the Government later argued (and the Court agreed) that it was unnecessary to pose this question to the jury because financial loss is not an element of the crime.

During jury deliberations, the jury submitted the following question: "What is the appropriate process for determining the amount on Counts 3 [and] 4?" The Court addressed this

---

[11] *Id.*

[12] *United States v. Cardinas Garcia*, 596 F.3d 788, 799 (10th Cir. 2010).

[13] *Id.*

[14] *United States v. Wilson*, 216 F. App'x 767, 769 (10th Cir. 2007) (citation and quotations omitted).

issue with the parties and responded to the jury in writing: "the Court has determined that the Government did not provide you with the evidence to make that calculation, so you need not complete the blank for those amounts on the Verdict Form. *See also* Instruction #20." Jury Instruction 20 stated:

> It is not necessary for the government to prove beyond a reasonable doubt that a health care program suffered financial loss, that a defendant profited from the acts alleged, or that the healthcare program was actually defrauded. Furthermore, it is not necessary for the government to prove that each individual component of the scheme was illegal; it is sufficient that the government show that the entire scheme involved fraudulent conduct.
>
> In other words, it is not necessary for the government to prove that the defendant was actually successful in obtaining money of funds from a health care program. An unsuccessful scheme or artifice is as illegal as a scheme or artifice that is ultimately successful.[15]

Here, Defendant is correct that the Government admitted that it was unnecessary to include the question on the verdict form. But this error warrants reversal only if the inclusion of this question unfairly misled the jury and Defendant offers no reason to believe that it did. As the Government correctly notes, the verdict form directed the jury to first determine whether Defendant was guilty or not guilty of health care fraud. Only if the jury found Defendant guilty did the verdict form direct the jury to determine the amount of loss. Nothing about the inclusion of the "amount of loss" question undermines the jury's initial finding that Defendant was guilty of health care fraud. To the extent it was a mistake to include the "amount of loss" question on the verdict form, the Defendant was not prejudiced by the error.

---

[15] Doc. 84 at 39.

### 2. *Number of pills listed in Indictment*

Counts 1 and 2 in the Indictment provide the approximate amount of prescription drugs Defendant was alleged to have distributed, including the total number of pills and how many grams those pills equaled. Defendant argues that the Indictment contains an error as to the number of pills of oxycodone were distributed during the conspiracy. As the Defendant correctly states: Count 1 alleges that Defendant distributed approximately 21,681 oxycodone pills, equaling approximately 579.95 grams, and Count 2 lists the same number of grams but a different number of pills at 20,681. In addition to this typographical error, Defendant argues that the Government produced no evidence matching either of those numbers.

The Government argues that to indict or convict a defendant under 21 U.S.C. § 841(a) and (b)(1)(C) it is not necessary to list the drug quantities, and the inclusion of the drug quantities in the Indictment is therefore surplusage. The Court agrees. The relevant subsections of § 841 state:

> (a) Unlawful acts. Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .
>
> (b) Penalties
> Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
>
> . . .
>
> (C) In the case of a controlled substance in schedule I or II . . . such person shall be sentenced to a term of imprisonment of not more than 20 years . . . .[16]

Although certain subsections of § 841 allow harsher penalties based on the quantity (and type) of drugs, the subsection that Defendant was indicted and convicted under does

---

[16] 21 U.S.C. § 841(a)(1), (b)(1)(C).

not. When an indictment "includes allegations that are not essential elements of the offense, such allegations are merely surplusage and the prosecution does not have to prove them."[17] Here, the jury was properly instructed on the elements of Counts 1 and 2, which did not include drug quantities as an element.[18]

### 3. Summary charts

Federal Rule of Evidence 1006 authorizes a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[19] "Although the materials upon which a Rule 1006 summary is based need not themselves be admitted into evidence, they must at least be admissible."[20] Furthermore, Federal Rule of Evidence 611(a) authorizes parties to use charts to summarize evidence already admitted into evidence.[21]

Here, Defendant argues that it was improper for the Court to admit into evidence summary charts prepared by the Government. Although Defendant does not specify which of the Government's many charts he objects to, he does state that the charts "confused the jury as to the amount of money Neighborhood Pharmacy made per pill on Dr. Henson's prescriptions versus the amount of money made per pill from other prescribers whose

---

[17] *United States v. Etenyi*, 720 F. App'x 445, 457 (10th Cir. 2017) (citation, alterations, quotations omitted).

[18] Doc. 84, at 24, 29.

[19] Fed. R. Evid. 1006.

[20] *United States v. Irvin*, 682 F.3d 1254, 1261 (10th Cir. 2012) (citation omitted).

[21] *See United States v. Renteria*, 720 F.3d 1245, 1252 (10th Cir. 2013); *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012); *see also United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) ("Rule 611(a) charts are not evidence themselves; they are used merely to aid the jury in its understanding of the evidence that has already been admitted, by, for example, reveal[ing] inferences drawn in a way that would assist the jury.") (internal citations and quotations omitted).

patients fill at Neighborhood Pharmacy." Based on this description, the Court infers that Defendant's argument addresses, at a minimum, Exhibit 161. Defendant argues that the chart is "highly prejudicial, lacked foundation, and should not have been admitted." Notably, Defendant asserts that the Government's charts were admitted despite the objection of defense counsel. However, the only objection that defense counsel raised with regard to any of the charts was based on cumulative evidence, not lack of foundation or prejudice.

The Court concludes that the summary charts were properly admitted. As an initial matter, Defendant stipulated to the foundation of all the underlying documents. Second, the Court disagrees that the charts are highly prejudicial. Exhibit 161, for example, compared the cost of prescriptions at Neighborhood Pharmacy for seven doctors, including Defendant's co-conspirator. Exhibit 161 included the number of prescriptions each doctor had filled at Neighborhood Pharmacy, the cost of each prescription to the patient, and the pharmacy's gross profit per prescription. The Exhibit further divided this information into prescriptions involving controlled substances and noncontrolled substances. Exhibit 161 showed that when Defendant filled a Henson prescription for noncontrolled drugs, the cost to the patient and Defendant's profits was comparable to the prescriptions written by the other six doctors. However, for controlled drugs, Defendant was charging Henson's patients exponentially higher prices and was making significantly higher profits when compared to the prescriptions written by the other six doctors.

At trial, the Court expressed some reservations about Exhibit 161. The Court's concern was based on Exhibit 161 combining all noncontrolled prescriptions together without accounting for whether some of the noncontrolled prescriptions were more

expensive than others. After the Court expressed its initial concern that the summary of the noncontrolled drugs might be skewed by varying prescription costs, it was defense counsel who insisted that the chart be admitted.[22] Furthermore, to the extent the chart was compiled without taking into account certain variables, the Court's line of questioning brought this issue to the jury's attention; the Defendant also had an opportunity to cross-examine the witness further about the charts and the information therein. The Court concludes that the admission of Exhibit 161 and the rest of the Government's summary charts does not warrant a new trial.

    *4.*       *Testimony about witness's veracity*

Finally, Defendant argues that one Government witness, Diversion Investigator O'Malley, testified about the veracity of another witness, Ashley Schussler-Osterman. Despite the Court instructing the jury to disregard the testimony, Defendant argues that this testimony was highly prejudicial and warrants a new trial.

The Government disputes that O'Malley's testimony challenged the veracity of Schussler-Osterman. The relevant testimony, which was elicited during Defendant's cross-examination, went as follows:

> Defense Counsel: ". . . your own testimony states that the sign was created [October 16] on a computer at [Defendant's] pharmacy, correct?"
>
> O'Malley: "The sign was created on [October 16] and printed on [October 20]."
>
> Defense Counsel: ". . . but Ashley Schussler testified yesterday that that sign was present in the pharmacy on October 14th of 2014, isn't that true?"
>
> O'Malley: "She did state that yesterday; however, in her interviews with us she had stated —"

---

[22] *See* Doc. 94-1 at 60–62.

>Defense Counsel: "Your Honor —"
>
>The Court: "The jury will disregard the truncated statement of the witness. That's not properly admitted in this case."
>
>Defense Counsel: "Let me ask that question again and please just answer yes or no. Ashley Schussler's statement yesterday under oath was that on October 14th of—of 2014 that sign was present in Neighborhood Pharmacy, correct?"
>
>O'Malley: "That was her recall yesterday under oath."

The Government argues that O'Malley never testified as to the veracity of another witness because Defense Counsel interrupted her statement before she could say what Schussler-Osterman had previously told O'Malley in an interview. The Government also argues that even if O'Malley's testimony about Schussler-Osterman was prejudicial, the Court cured the error by instructing the Court to disregard O'Malley's testimony. Indeed, the Court "presume[s] that jurors will follow clear instructions to disregard evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant."[23] There is no reason for the Court to conclude that the jury was unable to follow its instruction to disregard O'Malley's interrupted statement; neither would the Court classify O'Malley's statement as devastating to Defendant. Thus, the Court holds that O'Malley's statement was not prejudicial to Defendant.

### III. Conclusion

Defendant's Motion for a Judgment of Acquittal is denied. The Government produced sufficient evidence for a reasonable juror to convict on all four counts. Additionally, the trial contained no errors that would require the Court in fairness to give Defendant a new trial.

---

[23] *United States v. Herron*, 432 F.3d 1127, 1135 (10th Cir. 2005).

**IT IS THEREFORE ORDERED** that Defendant Ebube Otuonye's Motion for Judgment of Acquittal or New Trial (Doc. 91) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 22nd day of October, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE